IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| RICHARD HICKS; and JOCELYN HICKS, <br><br> Plaintiffs, <br><br> v. <br><br> GREGORY MIDDLETON, et al., <br><br> Defendants. | CIVIL ACTION NO.: 4:21-cv-3 |

**O R D E R**

This action arises out of the injuries Plaintiff Richard Hicks allegedly sustained at the Port of Savannah when Defendant Gregory Middleton struck Plaintiff with his personal vehicle. (See doc. 1-1, pp. 6–10.) Plaintiffs Richard and Jocelyn Hicks sued Defendants Gregory Middleton and Marine Terminals Corporation–East, asserting claims of negligence and loss of consortium. (See id. at pp. 7–9.) Specifically, Plaintiffs allege that Defendant Marine Terminals Corporation–East is vicariously liable for Defendant Gregory Middleton's negligent operation of the vehicle. (See id.) Presently before the Court is Defendant Marine Terminals Corporation–East's Motion for Summary Judgment, in which it argues that it is entitled to summary judgment because Defendant Middleton was not acting within the scope of his employment when he struck Plaintiff Richard Hicks. (Doc. 60.) The Motion is fully briefed by the parties. (Docs. 60-1, 82, 86, 90.) For the following reasons, the Court **GRANTS** Defendant Marine Terminals Corporation–East's Motion for Summary Judgment.[1] (Doc. 60.)

---

[1] Plaintiffs and Defendant Middleton request that the Court grant oral argument on Ports America's Motion for Summary Judgment. (Docs. 93, 94.) Having considered the parties' fully briefed submissions on Ports America's Motion for Summary Judgment, the Court finds that there is no need for a hearing. Accordingly, the Court **DENIES** Plaintiffs' and Defendant Middleton's Motions for Hearing. (Docs. 93, 94.)

**BACKGROUND**

I.   **Factual Background**

    A.   **Cargo Operations at the Port of Savannah**

Defendant Gregory Middleton is a member of the International Longshoreman Association–Local 1414 Union (hereinafter, "ILA 1414"). (Doc. 82-1, p. 1.) Defendant Marine Terminals Corporation–East (hereinafter, "Ports America") is one of three companies performing cargo operations at the Port of Savannah Garden City Terminal. (Id. at p. 2.) Ports America is a member of the Georgia Stevedoring Association ("GSA"). (Id.) GSA and ILA 1414 are signatories to a Collective Bargaining Agreement, pursuant to which ILA 1414 provides labor to stevedores, such as Ports America, at the Port of Savannah. (Id.)

Labor for longshoreman jobs at the Port of Savannah is hired out of the ILA 1414's hall. (Id. at p. 3.) Specifically, a "shape up" (or "check out") meeting is held one hour before the start of a shift for cargo operations. (Id.) At a shape up meeting, a "header" is selected based on seniority for each of the various longshoremen jobs available on each vessel, such as lashers, truck drivers, or "two-man gang" members.[2] (Id.) The header for each job then selects ILA 1414 members to work those jobs until all available positions are filled. (Id. at pp. 3–4.) When an ILA 1414 member is selected, the member gives his or her "union card" to the header, who then takes the card to the business office and enters the member's name into a computer. (Id. at p. 4.) The computer then generates a "gang card," which shows the member's assigned job, the assigned vessel, and the vessel's location. (Id.)

Once an ILA 1414 member is selected for a longshoreman job, the member is expected to be at the berth for his or her assigned vessel "ready to work" at the shift's start time. (Id. at pp. 8–

---

[2] A "gang man" prepares a vessel's deck for loading or discharging. (Doc. 66, pp. 70–76.)

9.) Thus, an ILA 1414 member selected for a job must travel from the union hall to his or her assigned vessel's berth. To be "ready to work," a longshoreman must have obtained a "game plan," donned his or her personal protective equipment, and attended a ship side safety meeting prior to the beginning of a shift. (Id. at pp. 9–10; see doc. 66, p. 139.) However, there is no established time that a longshoreman must arrive at his or her assigned vessel as long as the longshoreman is "ready to work" at the time the shift begins. (Doc. 82-1, pp. 8–9.) Indeed, Defendant Middleton testified that a longshoreman is not required to go directly to the vessel from the hiring hall following the shape up meeting, and could instead, for instance, go get lunch at a fast-food restaurant, so long as he arrived at the vessel and was ready to work before the shift began. (Doc. 66, pp. 45–46.)

Game plans, which show the manner and order in which cargo will be first unloaded from then loaded aboard the vessel, are generally available at the dock house closest to the cargo berth ("CB") where the vessel is located. (Doc. 82-1, p. 10; see also doc. 66, pp. 24, 52–53, 86, 138; doc. 67, pp. 43–44, 47–48; doc. 69, pp. 41–42, 46–47.) "[S]ometimes" the superintendent who has the game plans may be "running in between all the ships," and, when a longshoreman presents at the dock house closest to his assigned vessel, he may be told that the superintendent with the plans has gone down to another vessel at another container berth. (Doc. 67, p. 49–50; see also doc. 66, p. 52.) The record contains no testimony or other evidence, however, that the longshoreman would then be expected to go seek out the superintendent with the game plans at some other location. Furthermore, the record indicates only that the longshoreman is expected to *obtain* the game plans prior to commencing work; there was apparently no testimony that he is required to study them prior to commencing work. (See; doc. 67, p. 80; doc. 69, pp. 82–83; see generally docs. 82-1, 66.)

3

A longshoreman is employed by whichever stevedoring company is engaged to conduct cargo operations for his or her assigned vessel that day. (Doc. 82-1, p. 6.) Therefore, a longshoreman could work for one stevedoring company one day but work for a different stevedoring company the next day. (See id.) Furthermore, longshoremen are paid hourly, beginning at the official start time of their shifts. (Id. at p. 9.) Thus, longshoremen are not paid for the time it takes them to get "ready to work" (i.e., pick up the game plan, attend a safety briefing, and put on personal protective equipment). (See id. at pp. 8–10.)

**B.     The Accident**

On November 7, 2020, Defendant Middleton was assigned to work for Ports America on a "two-man gang" aboard the HYUNDAI LOYALTY (the "Vessel"), which was located at container berth 4 ("CB4").[3] (Doc. 82-1, pp. 10–11.) The official start time for Defendant Middleton's shift was 1:00 p.m. (Id. at p. 11.) The closest dock house to CB4 is located across from container berth five ("CB5"), (id. at pp. 11–12), which is adjacent to CB4, (see doc. 68, p. 48). After getting the job, Defendant Middleton left the union hall, (doc. 66, p. 131), and at 12:37:15 p.m., he entered the Port of Savannah through Gate 1, driving his personal vehicle, (doc. 82-1, pp. 12–13). Rather than driving directly to CB4, Defendant Middleton drove past CB4 to container berth 9 ("CB9") and then turned around and drove back towards container berth eight ("CB8"), where a different vessel (to which Middleton was not assigned to work) was docked. (Id. at p. 13; doc. 67, pp. 44–45.) At approximately 12:45 p.m., Defendant Middleton struck Plaintiff Richard Hicks while Plaintiff was standing next to a jockey truck located by the CB8 dock house, which is located at CB8. (Doc. 82-1, pp. 13.)

---

[3] The Garden City Terminal has nine container berths, numbered one through nine. (See doc. 68, p. 48.)

Though they both rely on statements and testimony given by Defendant Middleton, the parties dispute why Defendant Middleton drove past CB4, where the Vessel was located. To be fair, Defendant Middleton's deposition testimony was by no means crystal clear, and he frequently offered self-contradictory testimony. Plaintiff contends that, at the time the accident happened, Defendant Middleton was driving to CB8's dock house to obtain the game plans for the Vessel. (Doc. 82, p. 9.) This is supported by Defendant Middleton's responses to certain written discovery requests that were served upon him. (See doc. 66, pp. 129–32.) Defendant Middleton's deposition testimony regarding this contention, however, is inconsistent and confusing. For instance, when asked what he planned to do when he arrived at the Port, Defendant Middleton stated that his "plan was to go *to the ship* and get [the] plans." (Id. at pp. 86 (emphasis added).) Later in his deposition, however, he indicated that he was going to the dock house adjacent to CB8 to pick up the game plans (and also to heat up his food). (Id. at pp. 165–67.) Notably, however, there is no evidence that Middleton was told or had reason to believe that the game plans were not available for pick-up at the dock house adjacent to CB4 (as was customary) and that he instead needed to go past CB4 to get the plans from the dock house adjacent to CB8.

Nonetheless, the parties agree that, at the time of the Accident, Defendant Middleton had not (1) parked or exited his vehicle since arriving at the Port, (2) donned his personal protective equipment, (3) actually obtained the game plans for the Vessel, or (4) attended the required safety meeting. (Doc. 82-1, pp. 14–16.)

## II.   Procedural History

Plaintiffs filed suit against Middleton and Ports America in the State Court of Chatham County, (see doc. 1-1), and Defendants subsequently removed the case to this Court, (see doc. 1). Following the close of discovery, Defendant Ports America filed the at-issue Motion for Summary

5

Judgment, arguing that it is entitled to summary judgment on the claims asserted against it. (See docs. 60, 57.) The Motion has been fully briefed by Defendant Ports America and Plaintiffs. (Docs. 60-1, 82, 86, 90.)

**STANDARD OF REVIEW**

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv. Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011). When the nonmoving party would have the burden of proof at trial, the moving party may discharge its burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial. See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 256–57.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)). Accordingly, in considering Defendant's Motion, the Court views the record and draws all reasonable inferences therefrom in the light most favorable to Plaintiff. See Am. Bankers Ins. Grp. v. United States, 408 F.3d 1328, 1331 (11th Cir. 2005). However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (emphasis omitted).

## DISCUSSION

In the Complaint, Plaintiffs allege that Defendant Middleton negligently operated the vehicle when he struck Plaintiff Richard Hicks. (See doc. 1-1, pp. 7–9.) Plaintiffs also contend that Defendant Ports America is vicariously liable for Defendant Middleton's negligence. (See id.) In its Motion for Summary Judgment, Defendant Ports America argues that it is entitled to summary judgment on the claims asserted against it because it is not vicariously liable for Defendant Middleton's negligence. (Doc. 60-1, pp. 8–17.) Specifically, Defendant Ports America argues that Defendant Middleton was not its employee and that, even if he was its employee, he was not acting within the scope of his employment when the Accident occurred. (Id.)

According to Ports America, Defendant Middleton was not its employee at the time of the Accident because "he did not report to work on the day of the [Accident]." (Id. at p. 10.) However,

7

the Court need not decide that issue because, even assuming Defendant Middleton was Ports America's employee, and viewing the evidence in the light most favorable to Plaintiffs, the Court finds no facts in the record that would support a reasonable determination that Defendant Middleton was acting in the scope of his employment at the time of the accident.

Georgia's "common law principle of *respondeat superior* is codified . . . under O.C.G.A. § 51-2-2."[4]  Graham v. City of Duluth, 759 S.E.2d 645, 650 (Ga. Ct. App. 2014).  Under that statute, "[e]very person shall be liable for torts committed by his . . . servant by his command or in the prosecution and within the scope of his business, whether the same are committed by negligence or voluntarily." O.C.G.A. § 51-2-2.  Accordingly, "[a]n employer is liable for negligent or intentional torts committed by an employee only if the torts were committed in furtherance of, and within the scope of, the employer's business." Hendrix v. Snow, 170 F. App'x 68, 82 (11th Cir. 2006) (citing Piedmont Hosp., Inc. v. Palladino, 580 S.E.2d 215, 217 (Ga. 2003)).  "Whether an employee is acting within the scope of employment is normally a question for the jury 'except in plain and indisputable cases.'" Cotton v. Prodigies Child Care Mgmt., LLC, 870 S.E.2d 112, 114 (Ga. Ct. App. 2022); see Farzaneh v. Merit Constr. Co., 710 S.E.2d 839, 842–43 (Ga. Ct. App. 2011).

Ports America argues that Defendant Middleton was not acting within the scope of his employment because he was commuting to work at the time of the Accident and that, even if he was working within the scope of his employment when he left the union hall, he departed from "such course and scope at the time of the Accident." (Doc. 60-1, pp. 10–15; see id. at p. 16.) Plaintiffs respond that Defendant Middleton was acting within the scope of his employment when

---

[4] "The question of whether an employee's conduct was within the scope of his employment is governed by the law of the state where the incident occurred." Flohr v. Mackovjak, 84 F.3d 386, 390 (11th Cir. 1996) (internal quotations and citations omitted).  Here, the Accident occurred in Chatham County, Georgia, and the parties appear to agree that Georgia law governs.  (See doc. 60-1, p. 9; doc. 82, pp. 6–7.)

8

the Accident occurred because he was "driving to the dock house . . . to collect his game plans . . . for the necessary preparation of his employer's work that day." (Doc. 82, p. 12; see id. at pp. 10–12.)

Under Georgia law, "[t]here is a longstanding general rule that an employee is engaged in a purely personal matter while commuting to or from work." Centurion Indus., Inc. v. Naville-Saeger, 834 S.E.2d 875, 878–79 (Ga. Ct. App. 2019). Two exceptions exist for this general rule: the "special circumstances" exception and the "special mission" exception. See DMAC81, LLC v. Nguyen, 853 S.E.2d 400, 404 (Ga. Ct. App. 2021). First, "[t]he law is clear that[,] *in the absence of special circumstances*[,] a servant[,] in going to and from work in an automobile[,] acts only for his own purposes and not for those of his employer." Id. (emphasis added) (quotation and citation omitted). To determine whether special circumstances are present, Georgia courts examine factors such as "whether the employee was carrying work materials or using a cell phone or pager for work-related calls; whether the employee received a stipend for the use of his vehicle; or whether the employee was 'on call.'" Id. Second, an employee is not "deemed to act only for his own purposes while commuting to or from work" when the employee "undertakes a special mission at the direction of the employer." Centurion Indus., Inc., 834 S.E.2d at 879.

Here, the undisputed evidence establishes that Defendant Middleton was commuting to work when the accident occurred. The mere fact that he had departed from the ILA 1414 hiring hall (rather than his residence) does not—under the circumstances of this case—support a finding that he had begun acting within the scope of his employment with Ports America. The hiring hall (operated by ILA 1414) was simply where he attended a "shape up" meeting and was hired to perform work for Ports America, which would begin after he commuted to the jobsite and undertook actions within the scope of the employment. The Court finds especially critical

9

Defendant Middleton's own testimony that when he left the hiring hall after the shape up ended, he was free to go wherever he chose, so long as he was at the Vessel and ready to work by 1:00 p.m. (Doc. 66, pp. 45–46.) The fact that Middleton was within the Port grounds when the accident occurred (around 12:45 p.m.) does not impact the determination that he was commuting. He was still driving when the accident occurred, he had not reported for duty, and he was under no orders to be at any certain place for approximately another fifteen minutes.[5] Indeed, the record indisputably establishes that Defendant Middleton was free to turn his vehicle around and leave the Port premises if he desired, so long as he returned and reported to the Vessel ready to work by 1:00 p.m. Thus, he was not under Ports America's control and was acting for his own purposes when the accident occurred. See, e.g., Elam v. Ins. Co. of N. Am., 213 S.E.2d 546, 547 (Ga. Ct. App. 1975) (employee was not acting within the scope of his employment while driving home from work, even though he intended to complete paperwork once he arrived at home, explaining that, "[e]ven if the employee [could] be considered 'at work' when he reached his home where he worked on his employer's business, at most he was still only 'en route to or from his work' at the time of the collision . . ., there being no showing that he was in continuous employment, as a traveling salesman"); see also Mastec N. Am., Inc. v. Sandford, 765 S.E.2d 420, 424 (Ga. Ct. App. 2014) (relying on Elam, and finding that the evidence that the employee had "outstanding paperwork to complete once he arrived home from his last job" did not preclude summary judgment on the issue of *respondeat superior* because such facts did not prove that the employee was "acting within the scope of his employment *at the time of the accident*").

---

[5] Even assuming, *arguendo*, that Defendant Middleton's commute technically ended when his vehicle reached the area of the Vessel, he still did not report to the Vessel, but continued driving to another area of the Port, without having been told that he should or must do so. Thus, he still had not begun acting within the scope of his employment; instead, he chose—on his own—to continue driving around the Port, and thus was still "engaged in a purely personal matter," Centurion Indus., 834 S.E.2d at 880, even if that matter technically was no longer considered a "commute."

Defendant Middleton's claim that he was driving to a specific location (past the Vessel where he would actually be working) in order to obtain a copy of the game plans likewise does not impact the Court's analysis.  According to his own testimony, after passing the Vessel where he would be working (at CB4), Middleton was driving to the dock house adjacent to CB8 to, among other things, obtain a copy of the game plans. (Doc. 66, p. 167.)  While Ports America asserts—and Plaintiffs concede—that Defendant Middleton was expected to obtain the game plans prior to his assigned shift's start time, the record indisputably establishes that the game plans are almost always distributed at the dock house nearest to the Vessel.  There is no basis for a longshoreman to go to another area to obtain the game plans unless he is told or discovers that the game plans are in that other location (which would be out of the ordinary).  Here, there is no evidence that Defendant Middleton knew, was told, or otherwise had reason to believe that the game plans were not at or around the Vessel (at CB4 or its adjacent dock house).  Thus, there is no evidence that he needed to travel to CB8's adjacent dock house to obtain the plans.  There is no basis for a jury to reasonably determine that Middleton was not commuting to work at least until he parked, exited his vehicle, and commenced activities within the scope of his employment.  See, e.g., Mastec, 765 S.E.2d at 424; Elam, 213 S.E.2d at 547.

For all these same reasons, there is no basis for a jury to find that the "special mission" or "special circumstances" exceptions apply.  First, in order for the "special mission" exception to apply, "the errand or mission itself be a *special or uncustomary* one, *made at the employer's request or direction*." Betsill v. Scale Systems, Inc., 604 S.E.2d 265, 268 (Ga. Ct. App. 2004) (first set of emphasis added).  Obtaining the game plans is, undisputedly, a customary mission for a longshoreman, so going somewhere to get them does not meet the "special or uncustomary" requirement.  See Hargett's Tel. Contractors, Inc. v. McKeehan, 491 S.E.2d 391, 394 (Ga. Ct. App.

11

1997) (to fit within the exception, "the *errand or mission itself* must be a 'special' or uncustomary one made at the employer's request or direction," otherwise "the [special mission] exception would devour the general rule of no liability") (emphasis added).  Additionally, there is no evidence that Defendant Middleton had been requested or directed to go to the dock house near CB8 by Ports America.  (Indeed, there is no evidence that the game plans actually were available at that location.)  See, e.g., Betsill, 604 S.E.2d at 268 (employee, who, "on his own volition, decided to undertake certain work-related errands, including picking up [a] computer . . . and going to the office to check [on something]" on a non-workday was not on a special mission when he got in an accident on the way to pick up the computer, as the "evidence show[ed] that the decision to pick up the computer was [his own], rather than a directive from [his employer]").  Next, as to the "special circumstances" exception, there is no indication of any such circumstances; for instance, Defendant Middleton was not carrying work materials or equipment (other than his safety gear), was not using a cell phone or pager for work-related calls, was not receiving a stipend for the use of his vehicle, and was not "on call."  See Dougherty Equipment Co. v. Roper, 757 S.E.2d 885, 888–89 (Ga. Ct. App. 2014) (employee who was on his way to pick up his daily assignments was commuting and no exception applied because he was acting "to fulfill *his* duty of arriving at work on time, and no evidence showed that [he] was undertaking a duty at [his employer's] direction").

      In light of all the foregoing, Plaintiff has not presented sufficient evidence for a jury to conclude that Defendant Middleton was acting within the course and scope of any employment with Ports America at the time of the accident.  Accordingly, Ports America is entitled to summary judgment on all claims asserted against it.

**CONCLUSION**

Based on the foregoing, the Court **DENIES** the Motions for Hearing, (docs. 93, 94), and **GRANTS** Defendant Ports America's Motion for Summary Judgment.  (Doc. 60.)

**SO ORDERED**, this 26th day of September, 2022.

_____
R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA